Mignon Reinecke, Transferee v. Commissioner.
Mignon Reinecke v. Commissioner
Docket No. 33433.
United States Tax Court
1953 Tax Ct. Memo LEXIS 71; 12 T.C.M. (CCH) 1223; T.C.M. (RIA) 53348; October 30, 1953
Henry C. Lowenhaupt, Esq., 408 Olive Street, St. Louis, Mo., for the petitioner. Ray H. Garrison, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined against petitioner a liability as transferee of Carl J. Reinecke for deficiencies in his individual income taxes of $3,418.09, $3,243.00 and $3,516.65 for the years 1945, 1946 and 1947, respectively. All issues relative to the propriety of the deficiencies determined against the transferor were conceded by petitioner. The sole question is whether petitioner is liable for these deficiencies as transferee of certain assets of the taxpayer. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is an individual residing in Clayton, Missouri. She filed *72 Federal income tax returns for the years in controversy with the collector for the first district of Missouri. Carl J. Reinecke, hereinafter called "Carl," is an individual residing in Clayton, Missouri. He filed Federal income tax returns for the years in controversy with the collector for the first district of Missouri. Petitioner and Carl were married in 1948, immediately following Carl's divorce in Reno, Nevada from his former wife. In addition to being known as Mignon Reinecke and Mignon Estes, petitioner has also used the names "Mary Gordon" and "Mrs. M. Gordon" at certain times since 1945. Carl operated the C. J. Reinecke Lumber Company, a Missouri Corporation, until it made an assignment for benefit of creditors and discontinued operations on February 28, 1950. Carl subsequently became a lumber salesman for United Lumber Company, St. Louis, Missouri. Respondent determined deficiencies in income taxes against Carl for the years in controversy totaling $10,177.74, as a result of a revenue agent's examination revealing failure to include certain corporate distributions in his income during each year in controversy and improper deductions for alimony in two of the years *73 in controversy. Carl admitted tax liability as determined on January 25, 1950 and assessment thereof was duly made on March 25, 1950. Repeated demands were made upon Carl for payment of the assessed taxes. On March 25, 1937, Carl entered into an annual premium monthly retirement annuity contract (No. 739,384) with Phoenix Mutual Life Insurance Company, Hartford, Connecticut. That contract provided that Phoenix Mutual Life Insurance Company (authorized to do business in Missouri under section 377.200 to 377.460 of the Missouri Revised Statutes, 1949), herein sometimes called "Phoenix Mutual," should pay to transferor a monthly retirement income of One Hundred Sixty Dollars, beginning on March 25, 1952, and upon his death certain payments to the beneficiary, upon receipt of the policy by the Company. Transferor then reserved the right to change the beneficiary by compliance with the requirement of "filing at the Home Office of the Company a written notice thereof duly executed and accompanied by the policy for record of the change thereon by the Company. Unless the notice is so recorded it shall not take effect but when recorded, * * * it shall relate back and take effect as of the *74 date of the execution of said notice by the annuitant * * *." The maturity or cash value of the policy was payable upon surrender of the policy to the Company. The Home Office of the Company was at Hartford, Connecticut. In the latter part of May 1950, Carl indicated to the Government's collection agents that he then owned an annuity worth $18,000.00, and promised that he would borrow against it and pay the tax liability asserted against him. However, Carl refused to pay the assessment, and, instead of borrowing against the annuity as promised, he assigned it to petitioner without consideration sometime in May or June 1950. Liens were then filed by the Collector against all property belonging to Carl. The Collector notified Carl on May 26, 1950 that warrants for distraint had been given the collection agents. However, the collection agents were unable to collect from Carl. In the meantime, Carl had divested himself of all his assets. Despite all reasonable and continuous efforts to collect, the deficiencies and interest assessed against Carl for 1945, 1946 and 1947 have remained unpaid and owing with the exception of the following amounts collected on the designated dates: $14.68 *75 on June 4, 1951; $83.20 on May 8, 1951; $82.10 on April 29, 1951; $100.00 on October 23, 1951; and $73.48 on August 9, 1950. The collections were applied to the deficiency for 1945. Carl was required under the annuity contract to pay fifteen annual premiums of $1,220.64 each. The premiums were due on March 25 of each year, and were to continue until March 25, 1952. All premiums were paid when due, and the annuity contract remained in full force and effect until quitclaimed and surrendered to Phoenix Mutual on July 2, 1952 for $20,686.84 in full settlement thereof. During the duration of the annuity contract, Carl ordered numerous changes with respect to the beneficiary of any death benefits which might become payable. Carl named petitioner as beneficiary on March 22, 1946, the notice reading "Mrs. Mignon E. Estes, friend, #62 Broadview Drive, Clayton (5) Missouri," petitioner at that time being the wife of David Estes. On April 4, 1946, Carl directed Phoenix Mutual to correct the beneficiary designation by dropping the word "friend" after petitioner's name, making it read "Mignon E. Estes, whose present address is 62 Broadview Drive, Clayton 5, Missouri." Again, after petitioner *76 had married Carl, she was redesignated beneficiary under her married name, as of April 15, 1948. The annuity contract specifically provided that: "If the right to change the beneficiary has been reserved by the annuitant, an assignment, release or surrender of this policy or any interest therein by the annuitant, if of legal age, shall operate to the extent thereof to assign, release or surrender the interest of any and all beneficiaries hereunder." Carl on September 6, 1946, assigned the annuity contract to the First National Bank in St. Louis as collateral security for a $22,000.00 loan he obtained on that date from the bank. The assignment provided, in part, as follows: "For and in consideration of the sum of ten dollars ($10.00) and other valuable considerations, receipt whereof is hereby acknowledged, I/We hereby sell, assign, transfer and set over unto the First National Bank in St. Louis, a corporation of St. Louis, Missouri, Policy No. 739384 issued by the Phoenix Mutual Life Insurance Company, Hartford, Connecticut, on the life of Carl J. Reinecke together with all sums of money due or to become due thereon and all rights, privileges and benefits contained therein *77 or that may attach thereto, * * *
"It is expressly agreed that the following right is reserved and excluded from this assignment and shall not pass by virtue hereof: namely, the right to change the beneficiary under said policy, subject, however, to all rights of the Assignee hereunder. It is expressly agreed that the Assignee will, upon request, forward to the Company, the policy for endorsement of such change of beneficiary, but that such change of beneficiary shall be made subject to this assignment and shall not impair in any way this assignment or the rights of the Assignee hereunder, now existing or hereafter accruing." From September 6, 1946 to May 4, 1950, the First National Bank in St. Louis owned "all rights, privileges, and benefits" in the annuity contract except "the right to change the beneficiary, subject to the rights" of the bank. The original of the annuity contract was continuously in the physical possession of the First National Bank in St. Louis from September 6, 1946 to May 4, 1950, having been kept in the collateral vault of the said bank. Neither Carl nor petitioner had access to or possession of the annuity contract during the period September 6, 1946 to *78 May 4, 1950, and the only property interest Carl owned therein during that period was the right to change the beneficiary subject to the rights of the bank, and, upon payment of all his indebtedness to the bank, the right to have the annuity contract released to him. Carl's indebtedness to the First National Bank in St. Louis was $17,170.64 on May 4, 1950, on which date the debt was paid in full by Carl, and the bank released to him upon his signed receipt the annuity contract. Upon the bank's release of the annuity contract petitioner immediately attempted to obtain all property rights therein by means of a purported assignment signed by the father and sister of the petitioner and Carl's attorney. However, the document was never signed, acknowledged, or executed by Carl, and its receipt was never acknowledged by Phoenix Mutual. On June 9, 1950, Carl formally assigned the annuity contract to petitioner, the assignment being received by Phoenix Mutual on June 12, 1950 and recorded on June 15, 1950. The assignment provided, in part, as follows: "For value received, each of the undersigned hereby assigns and transfers policy No. 739,384 issued by the PHOENIX MUTUAL LIFE INSURANCE *79 COMPANY of Hartford, Connecticut, on the life of Carl J. Reinecke, and all right, title, and interest therein unto Mignon E. Reinecke, aged -, of St. Louis, Missouri, or the executors, administrators, successors, or assigns of the same. "Said assignee, or the executors, administrators, successors, or assigns of said assignee, shall have the right to receive all payments and benefits under said policy, to release or assign said policy to said insurance company for any cash, loan, or other value granted thereunder, and to exercise all other rights of absolute ownership under said policy." The annuity contract had a cash surrender value on the date of assignment to petitioner, which was not earlier than May 4, 1950 nor later than June 9, 1950, of $18,759.04. No consideration in money or money's worth was given to Carl by the petitioner for the annuity contract. Petitioner, upon being named assignee of the annuity contract, deposited the original thereof in her lockbox at the First National Safe Deposit Company, St. Louis. The annuity contract remained in petitioner's lockbox until she quitclaimed and surrendered it on July 2, 1952 to Phoenix Mutual. Petitioner's lockbox wherein *80 the annuity contract was kept after May 4, 1950 was obtained by petitioner in her alias "Mary Gordon," sometime in 1946. The name was changed to "Mrs. Mignon Reinecke" on April 22, 1948. Carl had access to the lockbox and the annuity contract while it was kept there except for the period February 26, 1951 to July 2, 1952 when petitioner and Carl were denied access thereto by action of respondent. Petitioner, upon her surrender of the annuity contract to Phoenix Mutual on July 2, 1952, received in full settlement thereof a cash payment of $20,686.64. Carl filed on June 1, 1950 with the Collector of Internal Revenue a statement of his financial condition as of May 31, 1950. In the financial statement, Carl declared under oath that he was "wrecked financially" and was then insolvent. Carl itemized his assets and liabilities as of May 31, 1950, as follows: Assets as of May 31, 1950
Cost
Forced Sale Value
Mortgages, etc.
Cash
$ 12
Accounts Receivable
(4,000)
Due from Reinecke Lumber Co.
Worthless
Notes Receivable
(16,000)
Due from Reinecke Lumber Co.
Worthless
Automobiles (2)
450 $50 $21
Stocks and Bonds
(10,000)
Reinecke Lumber Co.
Worthless
Real Estate
None
Total Assets
$ 12 $50 $21
Liabilities as of May 31, 1950
Accounts Payable
Unknown
Dividends
None
Notes Payable
Unknown
Interest
None
Real Estate Mortgages
None
Other Income
None
Chattel Mortgages
$ 21
Amounts Borrowed
18,000
Accrued Real Estate Taxes
None
Total
$25,100
Judgments
None
Total Liabilities
$ 21
*81 In addition, Carl itemized in the financial statement his receipts for the twelve months preceding June 1, 1950, as follows: Receipts
Salary and Commissions
$ 6,500
Rents
600
Carl filed with the Commissioner of Internal Revenue on September 18, 1950 an offer in compromise of his 1945, 1946 and 1947 tax liabilities, together with another statement of financial condition. In the statement of financial condition, Carl again declared under oath that his assets were insufficient to meet his obligations, and he itemized his assets and liabilities as follows: Present Book
Forced Sale
Assets
Value
Value
Cash
$ 12.00
$12.00
Cash surrender value of insurance
Accounts Receivable, worthless
(4,000.00)
None
Notes Receivable, worthless
(16,000.00)
None
Merchandise Inventory
Real Estate
None
Furniture and Fixtures
Machinery and Equipment
Trucks and Delivery Equipment
Automobiles (1)
250.00
50.00
Securities, worthless
(10,000.00)
None
Other Assets
Total Assets
$ 262.00
$62.00
Liabilities
Amount
Loans on Insurance
Accounts Payable
Notes Payable
Mortgages
Accrued Real Estate taxes
Judgments
None
Income taxes due U.S. Government
$10,177.74
Interest
Unknown
General Liabilities
Unknown
Total Liabilities
$10,177.74
*82 Carl itemized his receipts and disbursements during the previous twelve months (September 18, 1949 to September 18, 1950) as follows: Receipts
Description
Source From Which Received
Amount
Salary
$ 6,500.00
Commissions
Rents (Received from property at 1717 Cass, sold in March, 1950 in names
of Carl and Elizabe Reinicke [Reinecke])
600.00
Dividends
Amounts Borrowed
15,000.00
Interest Received
Received from sale of property at 1717 Cass Ave.
45,000.00
Total Receipts
$67,100.00
Disbursements
Description
Amount
Debt Reduction
Interest Paid
800.00
Insurance Premiums
1,224.00
Automobile Expense, estimated
800.00
Servants, wages
Living Expenses
Paid to former wife
29,000.00
Paid debts for former wife
approx. 15,000.00
Total Disbursements
$46,824.00
Carl's assets and liabilities before and after the transfer of the annuity, respectively, were as follows: Assets
Before
After
Balance in checking a/c at First National Bank in St. Louis
$ 7.73
$ 7.73
Cash value of Phoenix Mutual Life Ins. Co. annuity No. 739,384
18,759.04
Automobiles at cost
450.00
450.00
Cash on hand
12.00
12.00
$19,228.77
$ 469.73
Liabilities
Federal income tax def. for 1945 to 1947, inclusive, and interest
12,135.37
12,139.31
Owed Julia Reinecke
3,000.00
3,000.00
Owed on note payable to Albert Johns of L. E. Mahan & Co.
14,633.05
14,633.05
$29,768.42
$29,772.36
Excess of liabilities over assets
$10,539.65
$29,312.63
*83 Carl was insolvent when he acknowledged and executed the assignment of the annuity contract to petitioner. The effect of the assignment so far as Carl's financial status was concerned was a net increase of $18,772.98 in the excess of his liabilities over his assets. As early as May 1, 1950, which was only three days prior to the attempted assignment of the annuity contract to petitioner, Carl was insolvent, as indicated by the following reconstructed statement of Carl's assets and liabilities: May 1, 1950
Assets
Amount
Balance in checking a/c at First National Bank in St. Louis
$ 7.73
Trust Estate - Marie Ohmer, Trustee
39,989.88
Cash value of Phoenix Mutual Life Ins. Co. Policy #739,384
18,759.04
Automobiles at cost
450.00
Cash on hand
12.00
$59,218.65
Liabilities
Federal income tax deficiencies for 1945-46-47 and interest
$12,081.35
Owed First National Bank - St. Louis
17,170.64
Owed: S. C. Rogers
5,000.00
Geo. O. Durham
5,014.34
Wm. A. Griesedieck
5,000.00
Leo Gamp
500.00
Will Docter
500.00
L. Ray Schuessler
500.00
C. Roderick
2,500.00
Julia Reinecke
5,000.00
Marie Ohmer
100.00
Owed on note payable to Albert Johns
14,696.45
Chattel mortgage
21.00
$68,083.78
Excess of liabilities over assets
$ 8,865.13
*84 The fourteenth annual premium payment on the annuity contract, amounting to $1,220.64, was due on March 25, 1950. On April 24, 1950, which was within the thirty-one days of grace, Carl paid the fourteenth annual premium by borrowing $1,220.64 from First National Bank in St. Louis. On or about March 27, 1951, Carl paid the final premium ($1,220.64) due on the annuity contract assigned to petitioner. The payment was by check drawn on Carl's account in the name of Leslie J. Lees. Carl, in his financial statement as of May 31, 1950, sought to deceive and throw the Commissioner off guard and thereby delay, hinder and defeat the payment of his admitted 1945, 1946 and 1947 tax liabilities by the following false assertions under oath: (a) He had gross income in calendar year 1947 of only $8,000. (b) The First National Bank in St. Louis was the only bank or other financial institution with which he did business. (c) He had no safe-deposit box in his name or any other name. (d) The right to change beneficiary was not reserved by Carl in his Phoenix Mutual annuity contract. In the offer in compromise, and statement of financial condition of September 18, 1950 attached thereto, *85 Carl, though under oath, sought to deceive and throw the Commissioner off guard and defeat payment of his 1945, 1946 and 1947 tax liabilities by the following false assertions: (a) He had done business at no time during the previous three years (September 18, 1947 to September 18, 1950) with any bank or financial institution except First National in St. Louis. (b) He had disposed of no assets or property by sale, transfer, exchange, gift or in any other manner, except by sale for full value, from a year prior to the taxable period (that is, 1945, 1946 and 1947) to the present date (September 18, 1950). (c) He had no life interest or remainder interest, either vested or contingent in any trust or estate and was not the beneficiary of any trust. In addition, Carl declared he was not the grantor or donor of any trust. On August 31, 1951, respondent rejected Carl J. Reinecke's offer in compromise which stated that his stock in C. J. Reinecke Lumber Company, Inc., and his claims against that Company were worthless. Carl transferred, without consideration, to petitioner assets which consisted, among other things, of an annuity contract of a value in excess of the unpaid tax assessments *86 for 1945 through 1947, and thereby or theretofore became insolvent and wholly unable to pay the assessments due and owing. The annuity contract was transferred to petitioner in 1950 after the taxes against Carl for 1945 through 1947 had accrued. Carl formulated and conceived a plan which had the direct effect of hindering, defeating, and delaying the collection of income tax liabilities from Carl for the years 1945 through 1947. It involved inter alia the use of aliases, fictitious bank accounts, concealment of funds, admitted substantial understatement of income in income tax returns, omission of specific items of income from tax returns, filing of false statements with the Commissioner, and transfers of assets without consideration thereby rendering Carl insolvent. The assignment of the annuity contract to petitioner was a part of Carl's plan, the effect of which was to hinder, delay and defeat the collection of Carl's taxes. Petitioner is liable as transferee of assets from Carl for the deficiencies of income tax due from Carl for the taxable years 1945, 1946 and 1947 in the respective amounts of $3,418.09 (less collections in the total amount of $353.46); $3,243.00; and *87 $3,516.65, plus interest as provided by law. Opinion Although it is the transfer of three different types of property which is asserted by respondent to create a liability in petitioner as transferee of the taxpayer, the value of the first item, an annuity contract, appears to be adequate to cover the entire claim against the transferor provided the other conditions of transferee liability have been fulfilled. Since we have concluded that respondent must prevail in this regard as to the annuity policy we find it unnecessary to consider the effect of the other alleged transfers. The factual issues with respect to this policy have been resolved in our findings. Essentially, there being no dispute as to its value, the question is whether respondent has shown that the transferor was insolvent upon completion of the transfer. As to this there can be no serious question if the annuity policy was not transferred until May or June 1950. We have concluded that the facts show this to be the time of transfer. The annuity policy was delivered to the First National Bank of St. Louis as collateral on a loan to the transferor, the annuitant under the policy. The records of that bank were produced *88 and accompanied by the testimony of one of its officials demonstrate that the annuity policy was in the bank's physical possession continuously from September 1946 to May 4, 1950. Petitioner claims that notwithstanding this the policy itself was physically delivered to her in 1948 as symbolic of its assignment. Disregarding the interest of the witnesses who supported her in that assertion [1] the record is capable of a construction giving effect to their testimony and at the same time obviating the necessity of disregarding the official records of the bank. It appears that the transferor was also the insured under a life insurance policy outstanding in 1948 and having a face value of approximately the same principal amount. The witnesses could evidently have confused the two policies; and their testimony as to the physical delivery could have referred to the life insurance policy rather than to the annuity. Similarly, as to the petitioner's statements, the annuity policy shows that in April 1948 she made a beneficiary under the policy as "wife of the annuitant." Under the terms of the policy this could have been accomplished by a notice to the *89 insurance company even though endorsement on the policy itself might not have taken place until a later date. A confusion in petitioner's mind between being made the beneficiary or the assignee would not be unreasonable. Assuming then that the assignment of the policy itself did not take place until some time after May 4, 1950, at which time the transferor admitted that he was insolvent, we have determined that with respect to the annuity policy the requirement of insolvency of the transferor has been satisfied. Moreover, as this evidence indicates, the annuity policy was not a life insurance policy in the ordinary sense, see Helvering v. Le Gierse, 312 U.S. 531, and hence petitioner's claim of its removal from the reach of creditors under local law is unconvincing. But, be that as it may, even an exemption under Missouri law would not be adequate to frustrate the efforts of the Federal Government in the collection of tax liabilities. Christine D. Muller, 10 T.C. 678. That the transfer was without full and adequate consideration in money or money's worth also *90 follows. Even if the consideration for the transfer in 1950 was petitioner's prior agreement to marry the transferor, and even if marriage may be an adequate future consideration, yet as of the date of this transfer it was an executed consideration insufficient even to support a contract. 1 Williston on "Contracts" (Rev. Ed.), p. 508. That petitioner to some extent participated in what was presumptively a fraudulent scheme to defraud the transferor's creditors is reasonably apparent from the record. Godchaux Sugars, Inc. v. Quinn (Mo.), 95 S.W. (2d) 82; Ga Nun v. Palmer, 111 N.E. 223. And she having been shown to be a gratuitous transferee of a transfer made in fraud of the transferor's creditors, that alone is enough to shift the burden of going forward to the transferee. See Fada Gobins, 18 T.C. 1159, 1169; William Wiener, 12 T.C. 701. In addition, petitioner's liability is to some extent derived from equitable considerations. Section 311, Internal Revenue Code. And as we said in Sadie D. Leary, 18 T.C. 139, 144: *91 "Since petitioner was responsible * * * for exhausting the estate improperly and benefited personally thereby, under general equitable principles of estoppel and unjust enrichment and the maxim of clean hands, her defense disappears." Since the then value of the annuity policy was greatly in excess of respondent's claim against the transferor and since petitioner has been shown to be otherwise liable at law or in equity for taxes unpaid by him at that time, Decision will be entered for respondent. Footnotes
1. Her daughter and son-in-law.↩